Case No. 24-1331, Oakland Family Restaurant et al. v. American Dairy Queen Corp. Arguments not to exceed 15 minutes per side. Mr. Levasseur, you may proceed for the appellant. Thank you. Good morning, Your Honors. I would like to reserve four minutes for my rebuttal. All right. My name is Arthur Levasseur. I represent Oakland Family Restaurants and Lake Area Restaurants, two Michigan corporations that are under common control. And I'd like to also point out that the controlling shareholder, Nathan Hickling, is sitting in the front row of the courtroom here observing the proceedings. This appeal arises out of a dispute over the operative terms governing the transfer of two franchises, one owned by Oakland Family, the other owned by Lake Area Restaurants. The first sale of a franchise to one of my clients occurred in February of 2000, when Oakland Family acquired the rights to operate a Dairy Queen store in Farmington Hills, Michigan, along with the exclusive right to open additional Dairy Queen stores anywhere within a defined territory that was quite large and involved a good part of southwest Oakland County. Five years later, Lake Area Restaurants was created, and it acquired another section of Oakland County to the north so that between the two franchises at issue, my clients control or have the exclusive right to open Dairy Queen franchises in an area of about 300 square miles of Oakland County. It runs in parts from the very south end of the county, 30 miles north end. They have opened up. There was one store that existed before they opened any stores, or I guess two stores existed, but they operate 12 stores now within that area. The issues in this case involve the first issue we've raised in our brief involves purely a matter of contract interpretation. If you decide in our favor on that issue, you don't have to address the other issues. And that is really what is the effect of an amendment that was heavily negotiated before my clients bought their first franchise in 2000 with the folks from American Dairy Queen in Minnesota. And that provision came about as a result of the review of a letter that Dairy Queen had given the prior franchise, explaining under what conditions could they sell territory, which is the right to develop new stores in an area. If they were to develop one, when could they sell it or how could they sell it? What were the terms? And Dairy Queen at that time had said, as long as you develop the store yourself, you can sell it. You can retain one store, sell another store. If you want to sell some territory with the one store, you can do that. You just have to have an addendum to say who gets what territory. But I didn't say they were relinquishing their right to approve the transaction, did they? Well, the problem with that argument is that if you put down two conditions, and the addendum that was negotiated between my client was a part of this addendum that was signed the same day that my client bought the first franchise. It said as long as you develop the store and operate it for at least six months, then you can sell territory along with the franchise rights for an existing store. But it's about territory, isn't it? Well, the territory is part of the franchise. It's not about consent, isn't it? It's about the franchise rights that you have. If you can say, well, you can sell territory, but I'm not going to let you sell a store so you can't sell territory with it. Wasn't the question related to territory as opposed to will you modify the provision that requires your consent? I mean, the question was about territory, wasn't it? The question was about can I sell another store? If I develop one, can I sell territory with it? Right. The question was can we do that? I mean, you're saying it implicitly modifies the consent provision of the 65 franchise agreement, I guess. Absolutely it does. It doesn't do expressly. You have to read the 2000 addendum. The contract that my client has is not a 1965 contract. They have a 2000 contract with the 2000 addendum. Well, we go back to the original franchise agreement of 65, don't we? No, you have to read all the addendums. I know. We start there. Well, that was the original one, and the consent provision there, to be honest, is buried in the fine print for sure, and the parties had extensive negotiations about how long they'd have to operate a store before they could sell it with territory. So why would you say, well, as long as you operate for six months, as long as you develop yourself, you can sell territory with the franchise rights for an existing store, if they thought all they had to do was say no to signing the store, and then you can't sell territory? What if the proposed purchaser is totally unqualified to run a restaurant? They found out how they can split up territory, but they still have to have a qualified buyer, don't they? Had that been discussed? I mean, there's a lot of franchise agreements that say that. This franchise agreement doesn't say that. If that's their argument of why they need to consent is that Dairy Queen needs to make sure that a buyer is a qualified buyer, and, I mean, at least that's what their argument is. Well, the thing is, is why do we say specifically as long as you develop the store yourself, as long as you run it for six months, then you can sell territory with the franchise rights for a store? If they could just say we're not going to agree to assign a store, it negates the two conditions. Would it matter if it's six months or six years? In other words, you have to say what was the intent of putting in those two conditions for a transfer. The transfer of territory is the right to open new stores in that geographic area. It's one of the contractual rights that are there. What about the fact that the 2,000-year amendments specifically provide that the terms of the 1965 agreement, quote, shall remain in full force and effect unless they accept as specifically amended, and the 1965 agreement requires approval? So, I mean, the argument, I guess, or at least the decision of the district court on all this, was that rather than take out or modify the consent to assignment provision, what the 2,000 amendments did actually was to add further restrictions. Well, there was no reason to add those restrictions if they could just say no. There was absolutely no reason to do that. I don't want to belabor that point, but why would you say it's got to be six months if it's like we won't let you do it if it's 10 years? I mean, there's no reason to add those specific conditions if they could just say no anyway. And in any event, the second issue raised in the brief is the application of the Michigan Franchise Investment Law, which specifically says you can't have a provision that gives you unlimited rights to say no without any restrictions. Has any Michigan court interpreted that statute to have retroactive effect? There's no issue of retroactivity here, Your Honor. Well, no. Well, the contract, the sale that took place to my client took place, the first sale took place in 2000. The Franchise Investment Law says it applies to all oral and written arrangements between a franchisor and a franchisee in connection with the sale of a franchise. So the sale that we're talking about is the sale that took place in 2000, long after that statute was adopted. Well, I mean, isn't the argument, I thought your argument was that the Michigan Franchise Investment Law voided the provision of the 65 Franchise Agreement that required consent. Well, it voids that provision in the contract that my client has. My client has a contract. Okay, so you are arguing retroactivity. No, I'm not. You're arguing that the, is it a 74 statute or whatever retroactively applies to a 65 Franchise Agreement. My client didn't have a Franchise Agreement in 1964. I know, but you're, the fact that there's a reference to it. He's in privity with the prior purchaser. The sale that is the subject of the Michigan Act applies to the arrangements between my client and American Dairy Queen arising out of the sale that took place in 2000. Maybe we disagree with that, but to answer my question, do you know of any Michigan court that has applied the Michigan Franchise Investment Law retroactively? I don't know of any Michigan case that would fall within that. Okay, and the general rule of Michigan is the statutes have prospective effect? Yes, and you have to look at what the statute says here. It says it applies to all written and oral arrangements. The arrangements between my client and Dairy Queen did not exist until 2000. The Michigan, there is a Michigan case that says that the Franchise Investment Law applies to the sale from one franchisee to another franchisee, and in this case, that took place in 2000. This whole retroactivity argument is a red herring, Your Honor. All right, the final question I've got is about good cause under the statute. Even if the statute applies, there are exceptions. There's good cause exceptions, and the statute lists a few of them, and it says good cause shall include but not limited to. The first one is the failure of the proposed transferee to meet the franchise or's then current reasonable qualifications or standards. They appear to be talking about new standards that are necessary for the franchise agreement. Dairy Queen argues that the 60-year-old franchise contract from 1965 is outdated and new standards require a new franchise agreement, and how do you respond to that? That's what they say, but that's not true. My client's been operating under this franchise agreement since 2000. They've opened stores. They operate without any trouble. They comply with all of Dairy Queen's franchise. They say that the technology now is that they need to have Internet capability. They need to have ________. Well, they can certainly propose an amendment to the existing contract. Right now, my client's operating under that agreement without any problems, so the idea that it's impossible for them to administer their franchise system without having new agreements is completely untrue. It's belied by the fact that my clients are operating fine. They're opening new stores, meeting all the requirements, all under this contract. Just to be clear, your argument is that Dairy Queen doesn't have a right to approve a purchase transaction that your client may engage in to bring in a new franchisee at all, that your client can sell to whoever they want to without restriction. Is that your argument? My argument is, if they wanted additional restrictions on transfer, they could have put it in the addendum in 2000, just like they put in the six-month limitation and the you-have-to-develop-the-store-yourself limitation. They negotiated for weeks or months over this addendum. They certainly could have said, well, we want to put it in these provisions as well. Okay, just to understand your argument, though, your argument is that your client can sell to whomever they want to. Well, that's true. Hold on. We can't both talk at the same time. Sorry, Your Honor. And Dairy Queen just doesn't have anything to say about it. Well, the minute that buyer doesn't perform the contract, Dairy Queen can terminate it. I mean, they have all the rights in the world. If they're not complying with the standards, if they're not doing what they should do. All right, okay. Thank you. You'll have your rebuttal time.  Good morning, Your Honors. Good morning. May it please the Court, I'm Aaron Van Oort representing Dairy Queen. There are two questions in front of the Court. One is whether Dairy Queen has a contractual right to exercise prior consent over the assignment of this 1965 agreement to new owners. That's the contract question. The second question is, does the Michigan Franchise Law prevent it from exercising those consent rights here? Judge Berg answered the questions, yes, Dairy Queen has a contractual right, and no, the Franchise Law doesn't prohibit it from exercising it here. And I'll go in that order on that, Your Honor. First of all, Dairy Queen does have a contractual right. The plaintiffs agree that it's unambiguous in the 1965 agreement. They straight up agree that. The only issue is whether this 2000 addendum changed any of that. 2000, right, is when Mr. Hickling's group first got part of the territory from the existing franchise, and so they signed the short addendum. They're less than two pages. The addendum don't give any new rights. All they do is transfer, and then they say things they can't do. And as Your Honor pointed out, there's a clause in those addendum that says the 1965 agreement stays exactly the same unless it's specifically amended. And it was not specifically amended to change the consent rights. Judge Berg said all it did is add new restrictions, and that's right. Now, my opponent said, well, what's the point of adding new restrictions if you already had a consent right? The point was they had found out that Mr. Hickling was going behind their back with the existing owners trying to develop things without transferring. They wanted to make it really clear you couldn't do that. And so it's like if a crime happens and it gets a lot of publicity and was already illegal, the legislature passed a law to make it really clear it's illegal. That's what happened in 2000. So there is a consent right here. Counsel on the other side said, well, if they wanted to put rights in there and make it clear, why didn't they do it? Well, actually they did. There's a guarantee on this. It's the last page of every deal, so it's Record 26-14-2077. You know what they did in the guarantee? Mr. Hickling agreed he couldn't even change the ownership of his entity without Dairy Queen's prior express consent. He agreed to that on that. So no, Dairy Queen didn't give up its consent rights. As Your Honor pointed out, of course, if you're going to have somebody come into your system and use your name and threaten wrecking your brand, of course you're going to exercise a consent right. You're not going to give that up, and Dairy Queen never did it. So now we come to the second question, which is, does the franchise law prevent them from exercising that consent right here? And there are three different ways Your Honors can resolve that question in Dairy Queen's favor. Number one, say Michigan franchise law does not apply retroactively. Number two, you could say if it does apply retroactively, it's unconstitutional. Number three, you could say if it applies retroactively and isn't unconstitutional, the most it would ever do anyway is require good cause, and it's undisputed Dairy Queen had good cause. Now, option three is what Judge Berg did on this. And by doing that, he avoided the retroactivity and constitutional questions, so that's sort of like the judicial restraint approach on this. I think the cleanest way is just to say it's not retroactive. And Your Honor asked the question, has any court held this law to be retroactive? The answer is no, they haven't. And the only cases that have addressed this most closely, it's not this law, but it's a dealership law. There are two different cases that addressed whether a new good cause requirement would apply retroactively. It's this court's decision in Kia Motors, and then the Michigan Supreme Court addressed the same thing a year later in LaFontaine. And they held that a new good cause requirement, there it was good cause to add a new dealership within nine miles. They said that does not apply retroactively under Michigan law, because the presumption is it doesn't if it would affect vested rights, and requiring good cause would affect vested rights. So that's this court's Kia Motors, the Supreme Court. Now Judge Berg did not decide the retroactivity issue. He just decided the case based on the contractual provisions. What's wrong with that approach? No, it's a good approach on that, because like I said, he avoids the constitutional and retroactivity. So what he said, and this is entirely right, he said, even if you were to apply this new law, it's section 27 of the franchise law, the most it would do is require good cause to deny consent, 27G. And that's exactly the approach that Judge Merritt of this court took when Judge Merritt faced this question. It's in the general aviation Cessna cases. There are two of them that came up here. And he actually, those cases, the general aviation Cessna, were franchise law cases, and they also involved section 27, the same one section that's at issue here. In those cases, it was a renewal question rather than a transfer question. But it said, in there it said, you know, the language of the franchise law says it's void if you don't offer renewals on the same terms as you offer them to everybody else. It's void if you discriminate. The agreement there didn't have that limit. And so under plaintiff's approach, it would have been wiped out. But what Judge Merritt said is he said, you know, I'm going to read this to impose a nondiscrimination limit, and that's what the law is. So if you follow what Judge Merritt did in general aviation on the franchise law, on section 27, you'll do what Judge Berg did and said, you know, the more natural reading of this is to read good cause. And then on good cause, my opponent, they conceded or they forfeited probably more accurate. They never argued that there wasn't good cause. They didn't even argue the point. Your Honor, you know, it was a 1965 agreement. Internet didn't exist. Data security didn't exist. Food recalls didn't exist. Food safety didn't exist. Point of sale didn't exist. Internet marketing didn't exist. So, of course, none of it's addressed in that agreement. And what Judge Berg said on this, I'm just going to read on this. It's page 30 of his opinion. Hickling does not attempt to point to any evidence raising a fact question over the commercial reasonability of Derry Queen's decision to condition consent to his proposed transfers on execution of new agreements. So he waived it. And then Judge Berg found that there was plenty of reason. And I think Your Honor is going to understand this from the record. It's clear. Derry Queen would agree to the four new owners getting the stores and the territory. It's not standing in the way of that happening. It's saying, though, that if you're going to get new franchises in 2020, we're not going to do it under a franchise agreement that's 60 years old. And that's reasonable and commercially reasonable. So I think Your Honors, you can absolutely do that. If you do it, then you don't have to address retroactivity. If you do address retroactivity, as I said, the only precedent from this court and the Michigan Supreme Court is saying that good cause requirements are not retroactive. So let me just pause a little bit on that. So on Michigan, there's a presumption that laws are going to apply only prospectively. Unless, and here's the standard, unless the contrary intent is clearly manifested. And here, the provisions they're relying on were actually added in 84. They weren't part of the original law in 1974. They're added in 84. And with the 84 amendments, the Michigan legislature has a direct statement on retroactivity. It's Section 46. And it says, This Act does not impair or affect any right accruing, accrued, or required before this Act takes effect. It doesn't. It says, The same right may be enjoyed, asserted, and enforced as fully and to the same extent as if this Act had never been passed. So quite the opposite of clearly manifesting intent to apply retroactively. This said it doesn't on that. And I'm inferring this, Your Honors, but the lead Michigan Supreme Court case on retroactivity was decided in 82. It's the NRA certified questions. They got certified questions from this court, answered them, set the rules, and then two years later this amendment comes in. I think it's fair to say the legislature had this in mind because they're just directly mirroring what the Supreme Court said. Now, the other side says there's this provision in Section 7A. 7A that seems to create some confusion about retroactivity. If there's confusion, there isn't retroactivity, just to be clear, because the intent from the legislature has to be clear, and if the best they can do is confusion, they lose under that. But if Your Honors look at this 7A, it's an entire section just about a registration requirement. There are eight parts to it. Part 1 says you've got to register. Part 2 says if you register, it's good for a year. Part 3 says if you don't register, it's unlawful to sell a franchise. Part 4 says if you register, it's lawful. 5 says exceptions. 7 says the department has to remind you to register. 8 says you've got to register anyway, even if they don't remind you. And 6 is the one we're talking about here. And it says, it addresses the question, what if you've registered and then this new law comes into effect? Does everything you're selling become unlawful in the middle of the year? And 6 says, no, you can keep selling that year, and then you've got to re-up at the end of the year. So just to be clear, that provision does not create any ambiguity here. So just to come back, Your Honors, there's a contractual right here. They had good cause to exercise it. The franchise law doesn't get in the way. Either because it doesn't apply retroactively, or because the most it would ever do is require good cause, and there is, and so you can avoid it like Judge Burke. I'm happy to address any questions Your Honors have. I have none. I think we have your argument at hand. Thank you, Your Honor. Thank you. If you rebuttal. Thank you, Your Honor. I think the problem here is that my opponent is not looking at what the statute actually says. It doesn't say you can't refuse to allow transfer except for good cause. There are other Michigan statutes that do exactly that in the motor vehicle law and others. So if the legislature wanted to say that, they could have said that. They did not say that. They said you can't have certain provisions in the franchise documents, and you have to give notice ahead of time that if one of these is in these documents, it's not enforceable. So, therefore, you have to be able to assess the validity or not under Section 27 of the Michigan Franchise Investment Law at the outset of the franchise relationship. The franchisor has to give you the disclosure document, has the list of voided provisions, and has to give you a copy of the franchise agreement. If one of those are in there, you're told up front it's not enforceable. So the idea that this is just if 20 years later we say we want to transfer, and they say, well, we're going to look at whether there's good cause at that time or not, that's not what the law says. The law says you look at the provision up front, and it either is valid or it's not valid. The provision in this case says you can't assign without consent. And under Michigan law, that type of provision says you don't have to have good cause. You can just say no. So the franchise law says you can't have a provision that allows you to just say no. Now, the argument about retroactivity, if this case involved the 1965 franchisee, the issue of retroactivity might be relevant. But this does not involve my client was not a franchisee until 2000. And the statute says that it applies to all written or oral arrangements between a franchisor and a franchisee. Okay. There was no, my client wasn't a franchisee until 2000. It says in connection with the offer or sale of a franchise, including but not limited to the franchise agreement. The first franchise agreement that my client was a party to was an agreement that was signed in 2000, and it consisted of multiple documents, including the older agreement. But the fact is that you have to read them all together, and at the time that the contract was entered into, it was 2000, which is some 16 years after the statute came into effect. So to suggest it's an issue of retroactivity in 1965, it just isn't. The franchise sale that was subject to the law in this case took place in 2000. So that argument, I just don't see how that can be the basis for the decision in this case. And then in terms of the argument that as long as they had good cause, it's okay, the fact is they don't have good cause. All they wanted was to extract concessions out of the franchisee that they didn't already have in their existing franchise agreement. And the four examples of good cause provided in the statute, none of them says because the franchisor doesn't like the old agreement and wants a better one. I mean, that's in effect what they're saying. We want a better agreement that's better for us, gives us more revenue. I mean, the dollar difference in the value of what my client bought for several million dollars when they bought it and what Derry Coon would have us deal. What concessions are you talking about? You're making it sound like they want to renegotiate the entire agreement. Well, they do, absolutely. The new contract is completely different from the old one in terms of royalty rates. There's no development rates. My clients have built 12 stores or 11 new stores under their contract. If they sell one of their stores and the franchisee or the buyer sells the new contract, they can't open any more stores. They have no territory. It goes away. There's no way to transfer territory that my clients paid good money for under the belief that they had the right to assign territory as part of a sale of a store. Now they don't have that right if Derry Coon gets its way. I see my time is limited and I would thank the court for its consideration. All right. Thank you very much. Case shall be submitted.